IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:10-CV-00001-D

| | |
|---|---|
| ALICE M. HARRIS,<br><br>Plaintiff,<br><br>v.<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br><br>Defendant. | **MEMORANDUM &**<br>**RECOMMENDATION** |

This matter is before the Court on the parties' cross motions for judgment on the pleadings. Claimant, Alice M. Harris, seeks judicial review of the Commissioner's partial denial of her application for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). After a thorough review of the record and consideration of the briefs submitted by counsel, it is recommended that Claimant's Motion for Judgment on the Pleadings [DE- 12] be denied and the Commissioner's Motion for Judgment on the Pleadings [DE- 14] be granted.

## STATEMENT OF THE CASE

Claimant protectively filed an application for SSI on November 20, 2002 (R. 214) and an application for DIB on December 3, 2002 (R. 70). She alleged disability beginning October 15, 2001 due to blood sugar, high blood pressure, weak bowels, asthma, and arthritis pain in her joints. (R. 76.) The applications were denied initially (R. 58) and upon reconsideration (R. 64). Claimant then requested a hearing before an Administrative Law Judge ("ALJ") (R. 67), which took place on February 7, 2005 (R. 27). On July 18, 2005, the ALJ issued a decision denying Claimant's applications. (R. 18-24.) The Appeals Council denied Claimant's request for review on December 14, 2005 (R. 7), which rendered the ALJ's decision a "final decision" for purposes of judicial review.

*See Walls v. Barnhart*, 296 F.3d 287, 289 (4th Cir. 2002) (noting that when the Appeals Council denies a request for review, the underlying decision by the ALJ becomes the agency's final decision for purposes of appeal).

On March 10, 2006, Claimant commenced a civil action in this Court, *Harris v. Barnhart*, No. 5:06-cv-115-D (E.D.N.C. Mar. 10, 2006), pursuant to 42 U.S.C. § 405(g). On the Commissioner's motion, the Court remanded the matter for further administrative proceedings before an ALJ to consider "the effects of all impairments including the cardiac impairment and obesity." *Harris*, No. 5:06-cv-115-D (Aug. 21, 2006 Remand Order). On May 21, 2007, Claimant received a second hearing before the same ALJ that had previously denied her applications. (R. 480.) On June 21, 2007, the ALJ issued a decision finding Claimant to be disabled beginning on October 21, 2005, but not prior to that date. (R. 243-254.) The Appeals Council denied Claimant's request for review on December 2, 2009. (R. 228.) On January 6, 2010, Claimant commenced this action pursuant to 42 U.S.C. § 405(g).

## DISCUSSION

**I.     The Standard of Review and Social Security Framework**

The scope of judicial review of a final decision regarding disability benefits under the Social Security Act, 42 U.S.C. § 405(g), is limited to determining whether substantial evidence supports the Commissioner's factual findings and whether the decision was reached through the application of the correct legal standards. *Walls*, 296 F.3d at 290; *see also* 42 U.S.C. § 405(g). Substantial evidence is "evidence which a reasoning mind would accept as sufficient to support a particular conclusion." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). This Court must not weigh the evidence, as it lacks the authority to substitute its judgment for that of the Commissioner. *Walls*, 296

F.3d at 290. Thus, in determining whether substantial evidence supports the Commissioner's decision, the Court's review is limited to whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his or her findings and rationale in crediting the evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process to be followed in a disability case. 20 C.F.R. §§ 404.1520, 416.920. At step one, if the claimant is currently engaged in substantial gainful activity, the claim is denied. If the claimant is not engaged in substantial gainful activity, then at step two the ALJ determines whether the claimant has a severe impairment or combination of impairments which significantly limit him or her from performing basic work activities. If no severe impairment is found, the claim is denied. If the claimant has a severe impairment, at step three the ALJ determines whether the claimant's impairment meets or equals the requirements of one of the Listings of Impairments ("Listing"), 20 C.F.R. § 404, Subpart P, App. 1. If the impairment meets or equals a Listing, the person is disabled *per se*.

If the impairment does not meet or equal a Listing, at step four the claimant's residual functional capacity (RFC) is assessed to determine if the claimant can perform his or her past work despite the impairment; if so, the claim is denied. However, if the claimant cannot perform his or her past relevant work, at step five the burden shifts to the Commissioner to show that the claimant, based on his or her age, education, work experience and RFC, can perform other substantial gainful work. The Commissioner often attempts to carry its burden through the testimony of a vocational expert (VE), who testifies as to jobs available in the economy based on the characteristics of the claimant.

3

In this case, Claimant alleges the following errors by the ALJ: (1) failure to find that Claimant satisfied Listing 4.04; (2) failure to properly assess Claimant's credibility; and (3) failure to assess the impact of Claimant's obesity.

## II. The ALJ's Findings

The ALJ proceeded through the five-step sequential evaluation process as set forth in 20 C.F.R. §§ 404.1520(a), 416.920(a). The ALJ first found that Claimant had not engaged in substantial gainful activity during the applicable period from October 15, 2001, the alleged onset date, through March 31, 2005, the date last insured. (R. 246); *see* 20 C.F.R. §§ 404.1520(b), 416.920(b). The ALJ next found that, since the alleged onset date of disability, Claimant had suffered from the severe impairments of coronary artery disease with stent placement, obesity, diabetes mellitus, hypertension, asthma/chronic obstructive pulmonary disease, degenerative disc disease, and depression. (R. 246); *see* 20 C.F.R. §§ 404.1520(c), 416.920(c). However, at step three the ALJ determined that Claimant's impairments did not meet or medically equal one of the impairments listed in 20 C.F.R. § 404, Subpart P, App. 1. (R. 246); *see* 20 C.F.R. § 404.1520(d), (e), 416.920(d), (e). Next, the ALJ determined that, prior to October 21, 2005, Claimant had the RFC to perform light work with limitations. (R. 246.) At step four, the ALJ found that, prior to October 21, 2005, Claimant was able to perform past relevant work, but that after that date she could not. (R. 252-53); *see* 20 C.F.R. § § 404.1565, 416.965. The ALJ finally determined that, after October 21, 2005, there were not a significant number of jobs in the national economy that the claimant could perform. (R. 253); *see* 20 C.F.R. §§ 404.1560(c), 416.960(c). As a result, the ALJ found that Claimant was not disabled prior to October 21, 2005, but became disabled on that date

and continued to be disabled through the date of decision. (R. 254); *see* 20 C.F.R. §§ 404.1520(f)-(g), 416.920(f)-(g).

## III. The Administrative Hearing

### A. Claimant's Testimony at the Administrative Hearing

Claimant testified to the following at the May 21, 2007 administrative hearing. (R. 484-508.) At the time of the hearing, she was 64 years old and resided with her husband. (R. 485.) Claimant had completed high school and was literate. *Id.* She was not working and her only income was a Social Security early retirement benefit. (R. 485-86.)

Claimant last worked as the owner of a dress shop. (R. 487.) She could not recall the exact period of time, but estimated it to be in the early 1990s. *Id.* Claimant, with the help of her daughter, sold both dresses she ordered and children's clothing she herself sewed. (R. 487-48.) She ran the day to day operations of the shop, which included running the cash register, ordering supplies, and managing inventory. *Id.* Claimant had also worked as a sewing machine operator, but was unable to remember the exact period of time. (R. 488-89.) Her earnings records indicated wages from a dog kennel in Florida from 1999 to 2001, but Claimant indicated those were not her earnings and that she had not lived in Florida for 35 years. (R. 486, 489.) Claimant had difficulty recalling the time periods during which she performed certain work and required the assistance of her attorney to answer the ALJ's questions regarding her work history. (R. 488-89.) She testified that she had memory problems and at times could not remember her phone number. (R. 506-07.)

Claimant testified to a number of conditions that impeded her ability to work. Claimant had heart problems, but could not recall her diagnosis. (R. 504.) She was hospitalized three weeks prior to the hearing to have a stent placed in her heart, her second such procedure, and she had undergone

5

several catheterizations. (R. 490, 504.) Claimant testified to having a stress test a number of years ago. (R. 504.) She was taking a number of medications without notable side-effects. (R. 491-92.) Claimant was 5'2" and weighed 260 pounds at the time of the hearing. (R. 503.)

Claimant testified that she could no longer work as a sewing machine operator because she tired with minimal exertion. (R. 492.) For instance, she could not complete common household chores such as cooking, sweeping or laundry because she became too tired to stand. *Id.* Claimant's persistent exhaustion had increased in severity since the prior administrative hearing to the point that she had required in-home assistance for the prior year and a half. (R. 492-93, 499.) Claimant testified that she drove approximately twice a week to the store and back, but that she could no longer shop or go to church as she used to do. (R. 484, 499.) Sometimes a friend would take her out of the house to the cemetery or for a ride. (R. 501.)

Claimant also had persistent back problems over the prior 15 years and saw orthopaedic doctors. (R. 493, 505.) She walked with a cane, which she obtained a year and a half or more prior to the hearing because she could not balance herself. (R. 493-94.) She had severe and constant back and knee pain and took medication that provided little relief. (R. 493, 497.) In June 2005, Claimant received injections in her knees from a rheumatologist. (R. 505.) She could not walk far without pain and had to stop and sit down after about ten minutes. (R. 499.) Claimant testified that she could sit in a chair, but that she had problems getting up. (R. 499.) She could not lift anything heavy or even carry an armful of clothes due to pain. (R. 500-01.) Claimant took hot showers and laid down to ease her pain. (R. 498.) She would lay down on her bed for an hour and a half at a time about three times a day. (R. 498.) Claimant had also been seeing a foot doctor due to problems with

her right heel and foot that caused swelling in her foot and severe pain in both her foot and leg. (R. 502.)

Claimant had diabetes, which contributed to her fatigue. (R. 496-97.) Claimant had asthma for the past five or six years and had been hospitalized with breathing problems approximately five years earlier. (R. 495.) She also had sleep apnea and used a breathing machine. (R. 506.) Claimant had high blood pressure, which caused headaches, fatigue and a general sick feeling most of the time. *Id.* She was depressed, which she characterized as "overwhelming" and took Cymbalta, which was prescribed by her family doctor. (R. 495-96, 506.) Her depression, at times, kept her from doing things she could otherwise do, like paying bills, and she had trouble concentrating. (R. 507-08.)

### B. Medical Expert's Testimony at the Administrative Hearing

Dr. Helen Cannon testified as to her opinion of the Claimant's medical status. (R. 508.) Dr. Cannon characterized Claimant's medical history as "very complicated. (R. 509.) More specifically, Dr. Cannon testified that Claimant had a history of coronary artery disease and secondary hypertension. (R. 509-10.) Claimant had catheterization on February 11, 2003, which showed an ejection fraction of 70 percent. (R. 509.) In March 2004, Claimant returned to her doctor with complaints of angina, and another catheterization revealed some moderate coronary artery disease. *Id.* In August 2006, Claimant had a pulmonary embolism and was placed on Coumadin. *Id.* In April 2007, Claimant was stented, but she continued to have coronary artery disease and angina. *Id.*

Dr. Cannon also testified that Claimant was diagnosed with disruptive sleep apnea, obesity, diabetes, asthma, chronic obstructive pulmonary disease, a history of pneumonia, degenerative disc disease of her lower thoracic and lumbar spine, mild spinal stenosis at L4, L5, and L5S1,

7

osteoarthritis in both knees, psoriasis, bilateral carpal tunnel syndrome, and a major depressive disorder. (R. 509-10.) It was Dr. Cannon's opinion that Claimant's impairments did not meet or equal a Listing "for a prolonged period of time." (R. 510.) However, she further opined, based on Claimant's exertional and non-exertional diagnoses, that Claimant would have been unable to work eight hours a day, five days a week on a continuous basis beginning in October 2005. (R. 510-11.) Dr. Cannon testified that she gave more weight to the exertional diagnosis, although Claimant had "significant psychiatric diagnosis," but went on to explain that she concluded Claimant was unable to work full time as of the date of Claimant's psychiatric admission in October 2005. *Id.* Dr. Cannon noted that it was "somewhat difficult" to determine an exact date that Claimant became unable to consistently work full time. (R. 512.)

Dr. Cannon concluded that prior to October 2005, the most Claimant could have done was light work[1] with a sit/stand option and no heights, hazards, or production work. (R. 511.) This assessment was based on Claimant's cardiac condition, diabetes, obesity, and other primary exertional diagnoses. *Id.* Dr. Cannon opined that Claimant would need to sit every 30 minutes due to her osteoarthritis in her knees and the degenerative changes in her back and that she would be unable to perform production work based on her cardiac problems, diabetes, and obesity. (R. 512.)

In response to questioning by Claimant's attorney, Dr. Cannon stated that she could not say whether Claimant could do skilled, semi-skilled or unskilled work and that she just thought it was "reasonable" for Claimant to perform some kind of "not high output" work based on her condition. (R. 513.) She further explained at the time of Claimant's positive stress test in February 2003, she

---

[1] Dr. Cannon initially testified that Claimant could only tolerate low stress work, but later explained that she meant non-production work and that Claimant could tolerate the normal stress of a job. (R. at 511, 520.)

had "a very good ejection fraction" so that light work would have been medically reasonable. *Id.* Dr. Cannon also discussed that Claimant's MRI had shown no "really herniated disc" and "minimal encroachment." (R. 514.)

## C. Vocational Expert's Testimony at the Administrative Hearing

Dr. Stephen Carpenter, a vocational expert (VE), testified at the administrative hearing. (R. 515.) Dr. Carpenter stated that Claimant had performed past work (1) as a manager of a retail store, DOT code 185.167-046, strength level light, SVP 7, skilled; (2) as a dressmaker, DOT code 785.361-010, strength level light, SVP 2, unskilled; and (3) as a sewing machine operator, DOT code 786.685-030, strength level light, SVP 2, unskilled. (R. 516.) The ALJ then posed the following hypothetical to the VE:

> I want you to assume a hypothetical individual the same age, education, work background as that of the claimant who has the limitations described here today by Dr. Cannon, such as the person is limited to the performance of light work, would require that ability to alternately sit and stand with not being required to be in either position for more than 30 minutes at a time. Would have to avoid hazards such as heights, climbing ladders, similar activities and also would need to avoid production work which Dr. Cannon described it as no high output. First question, would that individual be able to do any of the claimants [sic] past work?

*Id.*

The VE responded that if this person could do skilled work she would be able to perform the managerial and dressmaker positions, as they were not production jobs, but that she could not do the production work of a sewing machine operator. (R. 516-17.) The VE stated that although many of the skills were transferrable, it would most likely require significant adjustment since she essentially managed a small dress shop and would most likely have to go outside the industry. (R. 517.)

9

The ALJ next asked the VE to assume a hypothetical individual with the limitations described by Claimant, *e.g.*, only able to walk for ten minutes at a time, stand for a second or two, and unable to carry clothes around the house. (R. 517.) The VE responded that such an individual that had difficulty with any level of exertion would be unable to perform any type of work. *Id.*

In response to questioning by Claimant's attorney, the VE acknowledged that the position of retail store manager was the next to highest level of skilled work. He explained that some larger employers would require college education, while smaller employers, such as a mom and pop convenience store, may not even require high school education. (R. 517-18.) The VE also explained that all jobs were characterized as either normal stress or high stress and that if a person could not tolerate normal stress then she could not perform any job. (R. 519.)

IV. **Claimant's Arguments**

A. **Assessment of Listing 4.04, Ischemic Heart Disease**

Claimant contends that the ALJ incorrectly assessed Claimant's impairment by failing to find, or thoroughly consider, that her impairments met or equaled Listing 4.04, Ischemic Heart Disease. Claimant points to (1) the ALJ's failure to explore whether Claimant's impairments specifically met Listing 4.04 with the medical expert; and (2) the ALJ's failure to recognize and consider Claimant's positive stress test.

The ALJ did not specifically address Listing 4.04, but generally stated that the medical evidence failed to "establish sufficient severity of impairment for the applicability of any [Listing] as is more fully outlined below." (R. 246.) The ALJ also noted that Dr. Cannon, the testifying medical expert at the hearing, opined that Claimant had not met or medically equaled a Listing for a long period of time. (R. 250.) In assessing Claimant's capacity to work, the ALJ did expressly

10

Case 5:10-cv-00001-D   Document 20   Filed 01/03/11   Page 10 of 19

consider her cardiac condition. (R. 248-49.) The ALJ acknowledged that Claimant was treated for cardiac symptoms in February 2003 after expressing dyspnea on exertion while doing housework or walking. (R. 248.) He noted that her echocardiogram was normal at that time, but that a dobutamine dual isotope study suggested mid and basal anterior ischemia, that a catheterization showed some disease with an ejection fraction of 70 percent, and that medication management was recommended. *Id.* He also noted that in March 2004, Claimant reported some improvement to her cardiologist, but still complained of occasional palpitations and angina on exertion. *Id.* The ALJ stated that a stress test was recommended, but that there was no indication that this was performed. *Id.* The ALJ concluded that the medical records did not support that Claimant's cardiac impairment was disabling, noting limited medical visits and testing related to her cardiac impairment, no restrictions placed on her by her physicians based on her cardiac impairment, and no complaints of cardiac symptoms in the medical records prior to February of 2003 or between March 2004 and October 2005. (R. 248-49.)

An ALJ is required to "explicitly identify and discuss relevant listings of impairments where there is 'ample evidence in the record to support a determination' that an impairment meets or medically equals a listing." *Kelly v. Astrue*, No. 5:08-cv-289-FL, 2009 WL 1346241, at *5 (E.D.N.C. May 12, 2009) (quoting *Ketcher v. Apfel*, 68 F.Supp.2d 629, 645 (D. Md.1999)). The Fourth Circuit has previously found error where the "ALJ failed to identify the relevant listings and to explicitly compare the claimant's symptoms to the requirements of the listed impairments." *Johnson v. Astrue*, No. 5:08-cv-515-FL, 2009 WL 3648551, at *2 (E.D.N.C. Nov. 3, 2009) (citing *Cook v. Heckler*, 783 F.2d 1168 (4th Cir. 1986)). However, "[m]eaningful review may be possible even absent the explicit step-by-step analysis set out in *Cook* where the ALJ discusses in detail the

evidence presented and adequately explains his consideration thereof." *Id.* (citing *Green v. Chater*, 64 F.3d 657, 1995 WL 478032, at *3 (4th Cir. 1995)). In this case, the ALJ's discussion of the evidence and explanation of his conclusions indicates that he sufficiently considered whether Claimant's cardiac impairment met or equaled a Listing.

The ALJ thoroughly summarized Claimant's cardiac history. (R. 248.) Claimant contends that the ALJ erred by stating that a stress test was not performed, when in fact a stress test was performed in February 2003. The Court disagrees. The ALJ stated that on February 7, 2003, Claimant "underwent an echocardiogram, which was normal, and a dobutamine dual isotope study which was suggestive of mid and basal anterior ischemia." *Id.* The dobutamine dual isotope study is the stress test to which Claimant refers, and the ALJ considered that test. The ALJ was not completely accurate in stating that the echocardiogram was normal. The medical record indicated that Claimant had "[o]verall normal LV systolic function," but that "[e]vidence for LV relaxation abnormality was noted." (R. 158.) The record also indicated that Claimant's EKG portion of the dobutamine stress test was abnormal. (R. 155.) However, the ALJ is not required to discuss every piece of medical evidence in detail. *See White v. Astrue*, No. 2:08-cv-20-FL, 2009 WL2135081, at *4 (E.D.N.C. July 15, 2009) ("To require an ALJ to refer to every physical observation recorded regarding a Social Security claimant in evaluating that claimant's depression, pain, or other alleged condition would create an impracticable standard for agency review, and one out of keeping with the law of this circuit.")

The ALJ's statement that "[a] stress test was recommended, however, there is no indication that this was performed" was not error. The medical records indicate that Claimant returned to her cardiologist on March 12, 2004, 13 months after her initial cardiac consultation. (R. 393.) The

cardiologist noted that while medical management had been previously recommended, "patient [] never returned for followup." *Id.* At the March 2004 visit, the cardiologist recommended another stress test and repeat echocardiogram, *id.*, but the Court found no medical record in evidence indicating those tests were conducted. The Court notes that at her first administrative hearing in February 2005, Claimant testified that her cardiologist administered a treadmill exercise test approximately six months prior to the hearing (R. 38), which the ALJ noted in his first decision (R. 21). However, the fact that such a test took place without specific information regarding its results is not useful to the ALJ or the Court. Furthermore, subsequent records from Claimant's visits to her primary care physician in June 2004, September 2004, January 2005, and March 2005 either make no mention of cardiac-related problems or indicate that her coronary artery disease was "clinically stable." (R. 388-391.)

Finally, the ALJ's failure to specifically discuss Listing 4.04 with the Medical Expert was not error. Dr. Cannon stated that she read all the medical evidence and opined that Claimant's impairments did not meet or equal a Listing for a prolonged period of time. (R. 508, 510.) Dr. Cannon acknowledged and discussed Claimant's history of coronary artery disease and concluded, based on Claimant's cardiac, diabetes, and obesity impairments, that Claimant would have been restricted to light non-production work with a sit/stand option prior to October 2005. (R. 509, 512.) Furthermore, Dr. Cannon specifically acknowledged the February 2003 positive stress test when questioned by Claimant's attorney and stated that it was medically reasonable at that time for Claimant to do light work with some restrictions based on Claimant's "very good ejection fraction." (R. 513.)

13

The Court finds that the ALJ sufficiently considered Claimant's cardiac impairment in reaching his decision, that his decision was supported by substantial evidence, and that the ALJ did not err by failing to specifically discuss Listing 4.04.

## B. Assessment of Claimant's Credibility

The Claimant contends that the ALJ's credibility determination, that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible prior to March 1, 2005," was based on a false finding of fact that her stress test was normal. The Court has concluded, as explained above, that the ALJ did not falsely conclude that the stress test was normal. Therefore, the ALJ's conclusion as to Claimant's credibility was not based on a false assumption, and Claimant's contention is without merit.

In assessing credibility, the ALJ must follow a two step process. First the ALJ must determine whether the claimant's medically determinable impairments could reasonably cause the alleged symptoms. *Craig*, 76 F.3d at 594-95. Next, the ALJ must evaluate the witness' statements regarding those symptoms. *Id.* at 595. The Social Security rulings require that an ALJ's decision "contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." S.S.R. 96-7p. When an ALJ fails to specify the reasons for an adverse credibility determination, remand is appropriate. *See Ivey v. Barnhart*, 393 F. Supp. 2d 387, 390 (E.D.N.C. 2005) (concluding that remand was appropriate because the ALJ failed to adequately explain the basis of his credibility determination). Here, the ALJ determined that the Claimant's medically determinable impairments

14

could reasonably cause the alleged symptoms, but that her statements regarding the effects of those impairments were not entirely credible for the period at issue.

In sum, the ALJ concluded that the medical records indicated that her impairments, including her cardiac impairment, were medically controlled prior to October 21, 2005, and therefore did not support Claimant's statements that she was exhausted by minimal exertion and unable to sustain even daily household chores. The ALJ's determination was supported by medical evidence in the record. As discussed above, the medical records from Claimant's visits to her primary care physician in June 2004, September 2004, January 2005, and March 2005 reflect that Claimant's conditions were medically managed. (R. 388-391.) Additionally, it was not improper for the ALJ to consider the lack of medical records for portions of the time period at issue. *See Chancy v. Astrue*, 2010 WL 2165341, at *5 (E.D.N.C. Mar. 25, 2010) (noting ALJ's consideration of "lack of records" and concluding ALJ sufficiently considered the medical evidence).

The ALJ also noted that the medical records indicated that Claimant could do some household chores and exercising. (R. 249.) On February 13, 2002, Claimant reported going to a fitness center and exercising every other day. (R. 125.) On January 20, 2004 and June 9, 2004, Claimant stated she would start exercising regularly. (R. 391-92.) At her initial hearing on February 7, 2005, Claimant testified that she did some cooking, washing and shopping, but that at times she would tire and have to rest. (R. 45.) These statements contradict her assertions that she was incapable of even minimal exertion. There is evidence in the record to support that Claimant had severe impairments, which the ALJ recognized. However, the fact that Claimant can point to other evidence in the record that supports the claimed impairments does not diminish the ALJ's analysis. When conflicting evidence is presented, it is up to the ALJ to resolve those inconsistencies. *Hays*

15

*v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). It is not the responsibility of this Court to determine the weight of the evidence, *id.*, and the Court may not substitute its judgment for that of the Commissioner. *Craig*, 76 F.3d at 589.

Finally, the ALJ relied on the RFC assessment completed by the State Agency in January 2003 (R. 147-154), which restricted Claimant to a medium work level. The Court notes that a subsequent RFC assessment completed in May 2003 cited Claimant's abnormal stress test and further restricted Claimant to a light work level, which supports the ALJ's conclusion. (R. 170-77.)

Accordingly, the Court finds that the ALJ did not err in his credibility assessment.

### C.     Assessment of Obesity

Claimant contends that the ALJ failed to assess the effects of Claimant's obesity. Social Security Ruling ("SSR") 02-1p dictates that obesity should be considered in determining whether (1) The individual has a medically determinable impairment; (2) The individual's impairment(s) is severe; (3) The individual's impairment(s) meets or equals the requirements of a listed impairment in the listings; and (4) The individual's impairment(s) prevents him or her from doing past relevant work and other work that exists in significant numbers in the national economy. S.S.R. 02-1p. In this case, the ALJ determined that Claimant had multiple severe impairments, including obesity. (R. 246.) The ALJ did not specifically discuss whether Claimant's obesity alone, or in combination with other impairments, met or equaled a Listing. (R. 246.) However, the Court finds that the ALJ considered Claimant's obesity in determining that her impairments did not meet or equal a Listing and that she was able to perform light work with restrictions prior to October 21, 2005.

The ALJ acknowledged that Claimant's doctor advised her to lose weight in July 2002 to control her blood sugar, but that there was no medical evidence that her obesity caused any

16

significant impairment prior to October 21, 2005. (R. 250.) The ALJ further noted that after October 21, 2005, Claimant's weight had increased considerably to 260 pounds and that she "was told by her neurologist, her primary care physician, and her podiatrists that her weight was her primary problem with respect to her joint and back pain and that it affected her impairments greatly." (R. 251.)

The medical records reflect that Claimant was obese in 2000, 2001, 2002 (R.193), that her weight was 238.5 pounds on March 6, 2003 (R. 401), that her weight was 242 pounds in August 2003 and that the doctor indicated it was a "major concerning factor" (R. 399), that her weight was 248 pounds on November 19, 2003 and that her doctor emphasized aggressive weight reduction (R. 395), that her weight was 245 pounds on January 20, 2004 and that she would start exercising (R. 392), that her weight was 244 pounds on March 12, 2004 and that she was morbidly obese (R. 393), that her weight was 234 pounds on June 9, 2004 and that she planned to start exercising (R. 391), and that on June 14, 2005 he doctor indicated that her morbid obesity was contributing to the osteoarthritis in knees (R. 387). Claimant's weight throughout the period in question appears to place her at the highest level of obesity or "extreme obesity" under SSR 02-1p, which "represents the greatest risk for developing obesity related impairments." S.S.R. 02-1p. However, the fact that a person maintains a high level of obesity does not *per se* "represent a degree of functional limitation that would prevent an individual from engaging in any gainful activity." *Id.* The medical records do not indicate that Claimant's obesity by itself or in combination with other impairments limited her functional capacity to do light work with some restrictions prior to October 21, 2005, as the ALJ concluded. Additionally, the Medical Examiner, upon whose testimony the ALJ relied, stated that she considered Claimant's obesity in her assessment. (R. 511.)

17

Finally, the Court rejects Claimant's contention that the ALJ's conclusion is erroneous because he used October 21, 2005 as his date of reference. The Claimant reasons that because she was involuntarily committed on that date, which does not relate to her physical conditions, that the ALJ erred. A fair reading of the ALJ's decision is that because the ALJ found Claimant to be disabled based on her mental condition as of October 21, 2005, he evaluated her other conditions prior to that date to determine if she was disabled earlier based on those other conditions. Therefore, it is reasonable for the ALJ to generally refer to Claimant's condition prior or subsequent to October 21, 2005.

Accordingly, the Court finds that the ALJ sufficiently evaluated Claimant's obesity and that his decision was supported by substantial evidence.

## CONCLUSION

The undersigned **RECOMMENDS** that Claimant's motion for judgment on the pleadings be **DENIED** and that the Commissioner's motion for judgment on the pleadings is **GRANTED**.

The Clerk shall send copies of this Memorandum and Recommendation to counsel for the respective parties, who have fourteen (14) days from the date of receipt to file written objections. Failure to file timely written objections shall bar an aggrieved party from receiving a de novo review by the District Court on an issue covered in the Memorandum and, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions not objected to, and accepted by, the District Court.

This the 3rd day of January, 2011.

DAVID W. DANIEL
UNITED STATES MAGISTRATE JUDGE